IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMANDWARE, INC.,

                      Plaintiff,

           v.

THE FINISH LINE USA, INC.,

                      Defendant.

Case No.

**COMPLAINT**

**[JURY TRIAL DEMANDED]**

## COMPLAINT

### Nature of Action

By this civil action, the plaintiff, Demandware, Inc., seeks to recover damages of the defendant, The Finish Line U.S.A., Inc., for breach of the Master Subscription and Services Agreement between the parties and violation of the covenant of good faith and fair dealing implied in that agreement. Notwithstanding the clear and unambiguous terms of the Master Subscription and Services Agreement, the defendant has failed and refused to make payments to Demandware in an amount that now exceeds $6,600,000. The plaintiff also seeks a declaration of the parties' rights and obligations under the Master Subscription and Services Agreement pursuant to 28 U.S.C. §§ 2201, *et seq.*, and Fed. R. Civ. P. 57 .

### Parties, Jurisdiction and Venue

1.      Plaintiff, Demandware, Inc. ("Demandware"), is a corporation duly organized and existing under Delaware law with a principal place of business at 5 Wall Street, Burlington, Massachusetts.

ActiveUS 114195389v.3

2.      Upon information and belief, defendant, The Finish Line USA, Inc. ("Finish Line"), is a corporation organized and existing under Indiana law with a principal place of business at 3308 N. Mitthoeffer Road, Indianapolis, Indiana.

3.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(2) based on diversity of citizenship in that the parties are organized and have principal places of businesses in different states, and the amount in controversy exceeds $75,000.00.

4.      This Court has personal jurisdiction over the defendant under the laws of New York, including, upon information and belief, because the defendant transacts substantial business in New York and under the state's long-arm statute, New York Civ. Prac. Law. §§ 301 and 302. In addition, each party has consented to, and has agreed that it is subject to, the exclusive jurisdiction of the state and federal courts of the State of New York with respect to any actions for enforcement or breach of the Master Subscription and Services Agreement.

5.      Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b)(1) and (d) because, upon information and belief, Finish Line transacts substantial business in the State of New York and otherwise is present in this district, and each party has consented to, and has agreed that it is subject to, the exclusive jurisdiction of the state and federal courts of the State of New York with respect to any actions for enforcement of or breach of the Master Services and Subscription Agreement between them.

## Statement of Facts

### *Master Subscription and Services Agreement*

6.      In or about May 2012, Demandware and Finish Line entered into a three-year contract known as the Master Subscription and Services Agreement, which included an Order

2

Form, and was effective as of May 25, 2012 (the "Agreement").  A copy of the Agreement is attached as Exhibit 1.

7.     The Agreement provided, *inter alia*, that Demandware would make Commerce Platform Services available to Finish Line pursuant to the terms and conditions of the Agreement in consideration of Finish Line's payment of certain fees and other charges specified in the Order Form.  In particular, Finish Line agreed to pay minimum fees in the amount of $6,250,000.00 for an initial three-year term, as follows:

|        | Monthly  | Annual       |
|--------|----------|--------------|
| Year 1 | $90,000  | $1,800,000   |
| Year 2 | $90,000  | $2,070,000   |
| Year 3 | $90,000  | $2,380,000   |

8.     The Commerce Platform Services to be provided by Demandware are defined in the Agreement as the online commerce service provided by Demandware via designated websites, utilizing the Demandware Technology, together with at least one Realm, as those terms are defined in the Agreement.  Ex. 1 (Agreement) at ¶ 1.

9.     The parties agreed that Demandware would use commercially reasonable efforts to make the Commerce Platform Services generally available to Finish Line 24 hours per day, 7 days per week.  The parties defined "availability" in the Agreement as the ability of Consumers of [Finish Line] to consummate orders via the [Finish Line] Web Site."

10.     The parties also agreed on a specific formula to be used to calculate "availability." Accordingly, they stipulated in section 7.4 of the Agreement that "availability" would be determined by the following calculation:

$$Availability = 100 \times \left( \frac{Total\ Minutes - Downtime}{Total\ Minutes - Excluded\ Downtime} \right)$$

3

They also provided specific definitions for each of the components of the "availability" formula. Ex. 1 (Agreement) at ¶ 7.4.

11.     Based on the parties' definition of "availability" as set forth in section 7.4, Demandware provided a Service Level Guarantee to Finish Line that the Commerce Platform Services would be available 99.5% of the time, except as otherwise provided in the Agreement (the "Service Level Guarantee").

12.     The Agreement provided for sole and exclusive remedies to be applied in the event that Demandware is unable to meet the Service Level Guarantee.  Ex. 1 (Agreement) at § 7.2.  Accordingly, the parties agreed that, if the actual Commerce Platform Services availability for a Realm and a given calendar month is less than the Service Level Guarantee, Finish Line would receive a service credit equal to a percentage of the applicable Realm subscription fee for such month in accordance with the table set forth in section 7.2 of the Agreement.

13.     Both parties further agreed that termination of the Agreement could occur if the Service Level Guarantee was not met, but only under certain limited circumstances contained within the Agreement.  Thus, the Agreement provided that Finish Line can elect to terminate the Order Form applicable to such Realm by providing written notice to Demandware within 30 days of the end of such period in the event that Finish Line is entitled to receive a service credit for (i) a Realm in any three calendar months during a subscription year, (ii) any consecutive two months during a subscription year, or (iii) any single month falls below 94.5%.

14.     The Agreement provided no other remedy, including the right to terminate the Agreement, in the event that Demandware is unable to meet the Service Level Guarantee.

4

15.    The parties further agreed that, except as expressly provided in the Agreement, Demandware makes no warranty of any kind, whether express, implied, statutory, or otherwise and specifically disclaims all implied warranties, including without limitation, any warranty of merchantability, or fitness for a particular purpose, to the maximum extent permitted by applicable law.

16.    In particular, Finish Line agreed specifically that Demandware does not represent or warrant that: (i) the Services will meet Finish Line's business requirements; (ii) the Commerce Platform Services will be error-free or uninterrupted or that the results obtained from its use will be accurate or reliable or (iii) all deficiencies in the Commerce Platform Services can be found or corrected. Ex. 1 (Agreement) at § 9.4.

17.    Demandware and Finish Line also entered into a Statement of Work, effective June 13, 2012, which , *inter alia*, described the work necessary to implement the Finish Line commerce web site using Demandware's Commerce Platform Services (the "SOW").

### Demandware Performs the Agreement

18.    Demandware began work under the Agreement and the SOW in or about June 2012 and collaborated closely with Finish Line personnel for approximately five months during the development and production phase of the project.

19.    Demandware and the third parties it contracted with to complete the implementation project spent a total of over 7000 person hours on the project.

20.    During this development and production period, Finish Line imposed unreasonable completion deadlines on Demandware, repeatedly insisting that Demandware complete its work before the start of the holiday shopping season, notwithstanding Demandware's warnings that requiring a launch of the Commerce Platform Services without

5

sufficient development and production time, could result in initial performance problems. Finish Line ignored Demandware's warnings.

21.    In one instance, despite Demandware's repeated warnings that lack of clarity could lead to significant delay, Finish Line insisted that development work begin prior to the parties finalizing a feature specification document ("FSD") outlining the scope of the project.

22.    In a second instance, Demandware warned Finish Line several times that a delay by the third party web design firm,  Big Spaceship ("Big Spaceship"), which was retained directly by Finish Line, could cause significant problems, including a reduced time to test the performance of the website. Big Spaceship failed to meet the deadlines, delivering its work product to Finish Line and Demandware after the deadlines had elapsed.

23.    Similarly, technical problems caused by TaxWare–Finish Line's contractor hired to implement the tax calculation features on the commerce site–plagued the project from the start and caused significant delays and performance issues.

24.    Nonetheless, Finish Line proceeded with its plans to launch its biggest ever marketing campaign and sale of Michael Jordan shoes at or about the start of the 2012 holiday shopping season when the Commerce Platform Services were slated to be launched.

25.    On or about November 16, 2012, one week before "Black Friday," which is generally considered the start of the holiday shopping season, Demandware implemented the Commerce Platform Services. Shortly thereafter, Finish Line held its biggest ever Michael Jordan sales and marketing campaign.

26.    Notwithstanding the unprecedented traffic on the Finish Line website due to the combination of holiday shopping and the Michael Jordan sales campaign, Demandware was able to maintain availability of the Commerce Platform Services in compliance with the Service

6

Level Guarantee specified in § 7 of the Agreement. Indeed, the only *days* during which availability dipped below the *monthly* Service Level Guarantee of 99.5% were Black Friday (94.73%), CyberMonday (97.13%) and the day after CyberMonday (90.01%), which did not constitute a breach of the Agreement. Accordingly, Demandware satisfied the Service Level Guarantee as agreed, and otherwise performed the Agreement.

### *Finish Line's Breach of the Agreement*

27.     However, despite Demandware's satisfaction of the Service Level Guarantee, particularly under Finish Line's unreasonable challenges, Finish Line wrongfully accused Demandware of breaching the Agreement, and wrongfully ordered Demandware to terminate the Commerce Platform Services and "take down" the Finish Line Realm no later than December 6, 2012. Demandware had no choice but to comply.

28.     In breach of the Agreement, Finish Line failed and refused to provide written notice to Demandware specifying Demandware's breach, or to provide Demandware with any opportunity to cure such alleged breach and ignored Demandware's plan for curing such alleged breach, and ordered Demandware to terminate the Commerce Platform Services and take down the Finish Line Realm.

29.     Thereafter, Finish Line has failed and refused to pay any additional fees to Demandware, including the minimum monthly and annual fees for the initial three-year term of the Agreement in the amount of $6,250,000.00, all as specified in the Order Form.

30.     Demandware has suffered actual damages in unpaid fees as of May 15, 2013 in the amount of $6,635,479.06 caused by Finish Line's breach of the Agreement.

### Demandware's Causes of Action

7

## COUNT I

[Breach of Agreement]

31.     Demandware repeats and realleges each and every allegation in ¶¶ 6-30 of the Complaint.

32.     Finish Line breached the Agreement by failing and refusing to (i) make payments to Demandware in accordance with the Agreement, (ii) provide Demandware with written notice specifying its alleged breach of the Agreement and an opportunity to cure the alleged breach or provide a plan for curing its alleged breach, and (iii) wrongfully compelling Demandware to terminate the Commerce Platform Services and take down the Finish Line Realm.

33.     Demandware has suffered damages resulting from Finish Line's breach of the Agreement in the amount of $6,635,479.06, together with interest, costs and attorneys' fees as allowed by law.

## COUNT II

[Breach of Implied Covenant of Good Faith and Fair Dealing]

34.     Demandware repeats and realleges each and every allegation in ¶¶ 6-33 of the Complaint.

35.     The Agreement contains an implied covenant of good faith and fair dealing.

36.     Finish Line has breached this implied covenant by wrongfully and in bad faith depriving Demandware of the fruits of its contract, including without limitation, by failing and refusing to (i) make payments to Demandware in accordance with the Agreement, (ii) provide Demandware with written notice specifying its alleged breach of the Agreement and an opportunity to cure the alleged breach or provide a plan for curing its alleged breach, and (iii) wrongfully compelling Demandware to terminate the Commerce Platform Services and take down the Finish Line Realm.

8

37.     Demandware has suffered damages resulting from Finish Line's breach of the Agreement's implied covenant of good faith and fair dealing in the amount of $6,635,479.06, together with interest, costs and attorneys' fees as allowed by law.

## COUNT III

[Declaratory and Injunctive Relief Requested Pursuant to 28 U.S.C. § 2201, *et. seq.*]

38.     Demandware repeats and realleges each and every allegation in ¶¶ 6-37 of the Complaint.

39.     Finish Line has materially breached the Agreement, and has violated the covenant of good faith and fair dealing by wrongfully and in bad faith, depriving Demandware of the fruits of its contract.

40.     However, Finish Line contends that it has not repudiated or committed a material breach of the Agreement, nor has it violated its covenant of good faith and fair dealing.

41.     Finish Line accuses Demandware of failing to substantially perform its material contractual obligations under the Agreement.

42.     An actual controversy has arisen and now exists between Demandware and Finish Line concerning the parties' respective rights and obligations under the Contract

43.     Resolution of the dispute between the parties as to whether, *inter alia,* Finish Line has materially breached the Agreement and the consequent rights and obligations of the parties, will serve a useful purpose in clarifying and settling the legal relations between Demandware and Finish Line.

44.     By reason of the foregoing, Demandware seeks a judicial determination by this Court of the rights and obligations owed to Demandware by Finish Line under the Agreement.

9

Such a judicial determination is necessary and appropriate at this time under the circumstances alleged.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff Demandware, Inc., requests the entry of judgment against Defendant The Finish Line USA, Inc. as follows:

(a)     With respect to Count I, an order directing The Finish Line USA, Inc. to pay damages to Demandware, Inc. in the amount of $6,635,479.06, together with interest, costs and attorneys' fees as allowed by law;

(b)     With respect to Count II, an order directing The Finish Line USA, Inc. to pay damages to Demandware, Inc. in the amount of $6,635,479.06, together with interest, costs and attorneys' fees as allowed by law;

(c)     With respect to Count III, an order declaring that the acts and practices complained of herein are in breach of the Agreement and that Finish Line is obligated to pay to Demandware the outstanding amount owed under the Agreement; and

(d)     Such other and further relief as the Court may deem just and proper.

ActiveUS 114195389v.3

Respectfully Submitted,

Dated:  August 12, 2013                    By:  _____

Robert Trenchard
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
Email: Robert.Trenchard@wilmerhale.com

*Of Counsel:*                              *Counsel for Demandware, Inc.*

Robert Cultice
Marissa Eisenberg
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Demandware, Inc.*

ActiveUS 114195389v.3

<u>**Exhibit 1**</u>

**ᗣdemandware**

accordance with the this Agreement, the Support Overview, and the applicable Order Form; (iii) implement and maintain backup, security and business continuity measures, in accordance with best industry practices, in order to maintain the security and integrity of the Commerce Platform Services, Customer Data and Consumer Data, including, without limitation, those set forth in Demandware Business Continuity and Security Policies and Procedures Overview located at *xehange.demandware.com/Demandware MSA Information*, as such overview may be updated by Demandware from time to time; provided, however, that Demandware will have no obligation to backup or maintain the security of Customer Data, Consumer Data and other data and materials that are within the control of Customer or that resides within the Customer's systems; (iv) maintain compliance with Payment Card Industry Data Security Standard v. 1.2 or better or any successor version thereof that becomes effective during the term (so as to be classified as a Level 1 Service Provider) ("PCI DSS") continuously during the term of this Agreement as required by applicable rules of credit card associations (including American Express, MasterCard and Visa); (v) upon request of Customer no more frequently than once per calendar year, provide Customer a copy of its most recent Attestation of Compliance with PCI DSS; (vi) comply with all applicable local, state, federal, and foreign laws (including laws regarding privacy and protection of consumer information) in making the Commerce Platform Services available to Customer; (vii) on or after December 31, 2012, upon request of Customer no more frequently that once per calendar year, provide Customer a copy of its most recent AICPA SOC2, Type 1 Report at Demandware's cost; and (viii) prior to Subscription Commencement (as defined in Exhibit A), assign a Commerce Strategist to Customer and provide a Commerce Strategist during the entire term of Customer's subscription for the Commerce Platform Services.

Demandware will not be responsible or liable for any failure to meet the foregoing responsibilities caused, in whole or in part, by the performance, adequacy, accuracy, concurrency or other matters related to Customer's systems. Demandware's obligations under this Agreement are conditioned upon Customer's compliance with the Data Resource Usage Policy.

**3.2 Customer Responsibilities.** Customer is responsible for all activities that occur under Customer's User accounts or by Consumers or Users of Customer Web Sites. Customer shall: (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all Customer Data and Consumer Data; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering or any other unauthorized access to, or use of, the Commerce Platform Services or the systems operated by or on behalf of Customer that capture, store or transmit Customer Data and Consumer Data, and notify Demandware immediately of any unauthorized use or security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regarding privacy and protection of consumer information) in using the Commerce Platform Services; (iv) comply with all applicable rules of credit card associations (including American Express, MasterCard and Visa); (v) obtain and maintain all computer hardware, software and communications equipment needed to access the Commerce Platform Services and pay all access charges (e.g., ISP fees) incurred while using the Commerce Platform Services; and (vi) provide Demandware with a completed Site Registration Notice no later than thirty (30) days prior to production launch of each Customer Web Site. Customer shall limit access to the Commerce Platform Services to Customer's Users.

**3.3 Use Guidelines.** Customer shall comply with the Demandware Data Resources Usage Policy. Further, Customer shall use the

Commerce Platform Services solely for its business purposes as contemplated by this Agreement and shall not: (i) license, sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share or otherwise commercially exploit or make the Commerce Platform Services available to any Affiliates or third party, other than as expressly permitted by this Agreement; (ii) interfere with or disrupt the integrity or performance of the Commerce Platform Services or the data contained therein; (iii) attempt to gain unauthorized access to the Commerce Platform Services or its related systems or networks; (iv) remove, alter or obscure any proprietary notices associated with the Commerce Platform Services; or (v) utilize the Commerce Platform Services in order to (a) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (b) send or store infringing, obscene, threatening, libelous, or otherwise unlawful, unsafe, malicious, abusive or tortious material, including material harmful to children or violative of third party privacy rights; or (c) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs.

**3.4 Customer's Privacy Policy.** Customer acknowledges and agrees that Demandware is processing Consumer Data on behalf of Customer and that, if required by applicable data protection legislation, Customer will inform third parties of such processing of Consumer Data and ensure that any required third parties have given their consent to such processing. Customer hereby agrees that the Customer Web Site(s) will feature a privacy policy, linked conspicuously from the Customer Web Site(s) home page, that (i) discloses Customer's privacy practices, (ii) identifies the collection (via cookies, web beacons and other applicable means) and use of information gathered in connection with the Commerce Platform Services or services provided by Demandware Providers; and (iii) if Customer collects, or plans to collect, personally identifiable information on the Customer Web Site(s) and transmits, or plans to transmit, such information to Demandware or a Demandware Provider, contains a statement specifically disclosing such practices (including transmission to a third party service provider) and offers site visitors an opportunity to opt out of (or opt-in, if applicable law requires) such use by third parties. Customer shall be responsible for creating and maintaining the necessary P3P privacy policies (i.e., the machine readable form of privacy policy that is provided with the cookie) to enable Customer to use, and Demandware to provide, various aspects of the Commerce Platform Services, and for ensuring that P3P privacy policy is consistent Customer's privacy policy posted on the Customer Sites. Demandware and any Demandware Provider shall not be liable in any way for any inaccuracies in such P3P policies or liability resulting therefrom. Further, if said P3P statement commits Customer to providing visitors to Customer Web Site(s) with an opt-out (or opt-in) mechanism, Customer will maintain such an opt-out (opt-in) mechanism for use in conjunction with the Customer Web Site(s).

**3.5 Third-Party Providers.** Demandware does not provide any warranties, guaranties or indemnification regarding any Third Party Providers or any of their products or services, whether or not such products or services are designated by Demandware as "certified," "validated" or otherwise. Any exchange of data or other interaction between Customer and a Third Party Provider, and, any purchase by Customer of any product or service offered by such Third Party Provider, is solely between Customer and such Third Party Provider.

**3.6 Press Releases; References.** Within thirty (30) days after execution of this Agreement, Demandware and Customer will issue a mutually agreed to and approved joint press release announcing the relationship. During the term of this Agreement, (a) Demandware may publicly refer to Customer orally and in writing, including on Demandware's website, as a customer of Demandware and may use Customer's logo for such purposes, and (b) Customer may publicly

**ⓓdemandware**

refer to Demandware orally, in writing, and on web sites operated by Customer, as a service provider of Customer. In addition, Customer Web Sites shall include "powered by Demandware" or similar language. The parties may also participate in other marketing and referral activities as may be mutually agreed.

**4.   Client Services and Miscellaneous Services.**

**4.1 Statements of Work.** Demandware may provide Client Services under the terms and conditions hereof, as specified in one or more statements of work that Demandware and Customer may enter into from time to time (each, a "Statement of Work" or "SOW").

**4.2 Miscellaneous Services.** Demandware may provide Miscellaneous Services under the terms and conditions hereof, as specified in one or more Order Forms or Statements of Work that Demandware and Customer may enter into from time to time.

**4.3 Modification.** If Customer wishes to change the Client Services covered by a Statement of Work or wishes to obtain additional services not listed in a Statement of Work ("Additional Services"), Customer, through an authorized representative, shall so advise Demandware, and Demandware may perform the Additional Services at its discretion. Upon Demandware's receipt of Customer's request for the Additional Services, the Customer and Demandware shall mutually agree upon the scope of the Additional Services by completing a change order form.

**4.4 Ownership of Work Product and Other Intellectual Property.** Demandware is the exclusive owner of all Work Product (including any revisions, modifications and enhancements thereto) and any other software, specifications, documentation, ideas, know-how, techniques, processes, inventions or other intellectual property that Demandware or its subcontractors may develop, conceive or deliver under this Agreement, including all patents, copyrights and other intellectual property rights thereto. This Agreement is not a sale and does not transfer to Customer any title or ownership in and to the Work Product. Subject of the terms of this Agreement and upon receipt by Demandware of full payment of fees and expenses due under the applicable Statement of Work, Demandware grants to Customer a non-assignable, non-exclusive, non-transferable license to use the Work Product solely in connection with the Commerce Platform Services. Except as expressly set forth in this Agreement or an applicable Statement of Work, Customer shall not (a) use the Work Product for itself or for the benefit of any other person or entity, or permit any third party to make such use, and (b) copy, modify, transcribe, store, translate, sell, lease, or otherwise transfer the Work Product, in whole or in part.

**4.5 Non-Solicitation.** During the term of this Agreement and for a period of one year thereafter, (a) Customer shall not employ or engage, or solicit for employment or engagement, any employee assigned or recommended by Demandware to perform Services for Customer hereunder; and (b) Demandware shall not employ or engage, or solicit for employment or engagement, any employee, independent contractor, consultant, agent or representative of Customer with whom Demandware had contact in connection with the performance of Services hereunder. The foregoing restrictions shall not apply to the hiring of any person responding to a solicitation published to the general public (e.g., through newspaper, internet, etc.).

**4.6 Demandware Personnel.** Demandware shall ensure that its employees and contractors performing the Client Services and Miscellaneous Services are reasonably qualified and experienced. Demandware shall use commercially reasonable efforts to replace any Demandware employee or contractor that Customer reasonably requests

to be replaced. In addition, Demandware shall take reasonable steps to ensure that its employees and contractors do not pose particular security risks.

**4.7 Timely Performance.** Customer acknowledges and agrees that the timely performance by Demandware of the Client Services and Miscellaneous Services is dependent upon Customer performing its obligations under this Agreement, any Statement of Work (including those specified as "Customer Obligations" (or other similar heading) in any Statement of Work) and in any applicable Order Form, and that any delay or failure to perform by Customer shall extend the time for Demandware to perform on a day-for-day basis unless otherwise agreed by the parties or unless such day-for-day extension would be unreasonable in its application.

**5.   Fees & Payment.**

**5.1 Fees.** Customer shall pay all fees and other charges specified in all Order Forms and Statements of Work. In addition, Customer may incur additional fees based on Customer's use of the resources provided by Demandware as set forth in the Demandware Data Resources Usage Policy. Except as otherwise provided in an Order Form or Statement of Work, all fees and other charges are quoted in United States dollars. All amounts payable hereunder are non-refundable other than prepaid fees paid by Customer for Services not provided by Demandware.

**5.2 Invoicing & Payment.** Unless otherwise stated in an Order Form or Statement of Work, (i) all fees and charges are due net thirty (30) days from the invoice date, and (ii) all payments made under this Agreement shall be in United States dollars. Any amounts not invoiced within one hundred eighty (180) days of service performed or product tendered shall be waived.

**5.3 Overdue Payments.** Any payment not received from Customer by the due date may accrue (except with respect to fees or charges then under reasonable and good faith dispute), at Demandware's discretion, late charges at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid. Customer must notify Demandware in writing of any fees or charges disputed in good faith within thirty (30) days of the invoice date and any fees or charges not disputed within such thirty (30) day period shall be considered valid and no adjustment will be made. In no event shall Customer's notice of good faith dispute relieve Customer of its obligation to pay, in full, all undisputed amounts due.

**5.4 Suspension of Services.** If Customer's account is overdue (except with respect to fees or charges then under reasonable and good faith dispute), in addition to any of its other rights or remedies available to Demandware hereunder or at law or equity, Demandware reserves the right to suspend the Services, without liability to Customer, until such undisputed amounts are paid in full; provided that, in any case, prior to any suspension of the Services under this Section 5.4, Demandware has provided Customer fifteen (15) days prior written notice of its intention to suspend the Services and Customer has failed to bring its account current during such period.

**5.5 Taxes.** Unless otherwise stated in an Order Form or Statement of Work, Demandware's fees do not include any local, state, federal or foreign taxes, levies or duties of any nature ("Taxes"). Customer is responsible for paying all Taxes, excluding only taxes based on Demandware's income. If Demandware has the legal obligation to pay or collect Taxes for which Customer is responsible, the appropriate amount shall be invoiced to and paid by Customer to Demandware unless Customer provides Demandware with a valid tax exemption certificate authorized by the appropriate taxing authority.

ⓓdemandware

**5.6 Billing and Contact Information.** Customer shall maintain complete and accurate billing and contact information with Demandware at all times.

**6.** **Proprietary Rights.**

**6.1 Reservation of Rights.** As between Customer and Demandware, Demandware owns all right, title and interest in and to the Commerce Platform Services, Miscellaneous Services, Demandware Marks, Demandware Technology, Demandware IP Rights, and all rights of Demandware or Demandware's suppliers in the underlying code, tools or other materials necessary to effect the look and feel of the Customer Web Site(s). Customer's use of the Demandware Marks as authorized herein shall not create in Customer's favor any right, title or interest therein. Customer hereby assigns and will assign and will cause each of its Users to assign to Demandware all right, title and interest in and to any and all Demandware Technology created, developed or reduced to practice by or on behalf of Customer or any of its Users, other than the limited license rights granted in this Agreement. Other than as expressly set forth in this Agreement, no license or other rights in or to the Commerce Platform Services, Miscellaneous Services, Demandware Technology or Demandware IP Rights are granted to Customer, and all such licenses and rights are hereby expressly reserved.

**6.2 License Grant.** Subject to the terms and conditions of this Agreement, Demandware grants Customer and its Users a limited, worldwide, non-exclusive, non-transferable (except in connection with a permitted assignment of this Agreement), non-sublicenseable right to (a) access and use the Commerce Platform Services, and (b) modify Demandware Technology, excluding any Demandware Marks, solely as expressly permitted by the Commerce Platform Services, in each case, solely in accordance with the terms of this Agreement.

**6.3 Restrictions.** Except as expressly permitted by this Agreement, Customer shall not (i) use, make, have made, sell, offer to sell, reproduce, modify, copy or create derivative works based on the Commerce Platform Services, Miscellaneous Services or Demandware Technology; or (ii) disassemble, reverse engineer, or decompile the Commerce Platform Services, Miscellaneous Services or Demandware Technology,; (iii) create Internet "links" to or from the Commerce Platform Services, or "frame" or "mirror" any content forming part of the Commerce Platform Services in such a manner as to utilize a Customer Storefront as a banner or pop under for advertising purposes; or (iv) provide, maintain access or use the Commerce Platform Services in any manner inconsistent with this Agreement.

**6.4 Customer Property.** As between Demandware and Customer, Customer owns all right, title and interest in and to any trademarks, trade names, service marks, or logos of Customer, Customer Data, Consumer Data, and Customer Technology. Customer Data and Consumer Data shall be considered Confidential Information of Customer subject to the terms of this Agreement. Customer hereby grants Demandware a non-exclusive, royalty-free right to access and use (i) Customer's User accounts, including Customer Data and Consumer Data, solely in connection with performing the Commerce Platform Services, the Miscellaneous Services and related services and (ii) Aggregate Information for research, marketing and other purpose reasonably required to develop, deliver and provide to Customer ongoing innovation to the Commerce Platform Services. The parties acknowledge and agree that all right, title and interest in and to the Customer Storefront shall, as between Customer and Demandware, remain the sole and exclusive property of Customer, provided, however, that Customer's use thereof shall be subject to the applicable restrictions set forth in Section 6.3.

**6.5 Suggestions.** Customer may, from time to time, provide suggestions, techniques, know-how, comments, feedback or other input to Demandware with respect to the Commerce Platform Services (collectively, "Suggestions"). Both parties agree that each Suggestion is and shall be given entirely voluntarily. Each Suggestion, even if designated as confidential by Customer shall not, absent a signed, written agreement with Demandware, create an obligation of confidentiality for Demandware. Customer agrees that it shall not give any Suggestion that is subject to license terms or restrictions that seek to require any Demandware technology, service, product or documentation incorporating or derived from such Suggestion, or any Demandware intellectual property, to be licensed or otherwise shared with Customer or any third party. Furthermore, except as otherwise set forth in a separate, subsequent written agreement between the parties, Demandware shall be free to use, disclose, reproduce, license or otherwise distribute and exploit each Suggestion as it sees fit, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise. For the avoidance of doubt, Suggestions shall exclude any Customer Technology.

**7.** **Service Level; Resource Levels**

**7.1** **Service Level Guarantee.** For each Realm, the Commerce Platform Services will be available ninety nine and one half percent (99.5%) of the time, except as otherwise provided in this Agreement (the "Service Level Guarantee").

**7.2 Service Credit/Remedies.** If actual Commerce Platform Services' availability for a Realm and a given calendar month is less than the Service Level Guarantee, Customer will receive a service credit equal to a percentage of the applicable Realm subscription fee for such month in accordance with the following tables:

| Availability | Service Credit |
|---|---|
| Less than 99.5% but greater than or equal to 98.5% | 15% |
| Less than 98.5% but greater than or equal to 97.5% | 25% |
| Less than 97.5% but greater than or equal to 96.5% | 40% |
| Less than 96.5% but greater than or equal to 95.5% | 50% |
| Less than 95.5% but greater than or equal to 94.5% | 55% |
| Less than 94.5% | 60% |

In addition, if the Customer is entitled to receive a service credit for (i) a Realm in any three (3) calendar months during a subscription year, (ii) any consecutive two months during a subscription year, or (iii) any single month falls below 94.5% Customer may elect to terminate the Order Form applicable to such Realm by providing written notice to Demandware within thirty (30) days of the end of such period.. The remedies set forth in the Section 7.2 shall be the sole and exclusive remedy of Customer, and Demandware's entire liability, for a failure to meet the Service Level Guaranty.

**7.3 Reporting and Claims.** Demandware utilizes third-party tools (such as, but not necessarily including, Gomez (www.gomez.com) Internet performance Management tools) as part of its framework for monitoring and assessing its service level performance. This information may be obtained by Customer upon specific request. Within fifteen (15) days following the end of a calendar month in which Demandware fails to meet the Service Level Guarantee, Demandware shall provide Customer with a written report of the total number of unplanned downtime minutes for such month along with a calculation of the corresponding Service Level Fee Reduction for such month. To

ⓑdemandware

dispute such report or to file a claim for a service level fee reduction. Customer must send an email to sla@demandware.com (or such other address designated in writing by Demandware) with the following details within thirty (30) days of the end of the month for which a claim is made: (i) billing information, including Customer name, billing address, billing contact and billing contact phone number; (ii) downtime information with dates and time periods for each instance of downtime during the relevant period; and (iii) an explanation of the claim made under this Agreement, including any relevant calculations. All claims will be verified against Demandware system records. Should any periods of downtime submitted by the Customer be disputed, Demandware will provide the Customer with a record of Commerce Platform Services availability for the period in question. In addition, for any month Demandware fails to meet the Service Level Guarantee, Demandware will: (i) perform an analysis to identify the causes of such failure; (ii) provide Customer, via Demandware's case management system, with a written report of the results of such analysis and the procedure for correcting the failure; and (iii) keep Customer informed, via Demandware's case management system, of the status of Demandware's remedial efforts with respect to such failure.

**7.4 Definitions and Conditions.**

"Availability" means the ability of Consumers of Customer to consummate orders via the Customer Web Site, as determined by monitoring the performance of the Demandware SiteGenesis Storefront associated with the Customer's Web Site(s). Availability will be calculated as follows for each calendar month that the Commerce Platform Services are available through the Internet and that Customer has established connectivity:

$$Availability = 100 \; X \; \frac{Total \; Minutes - Downtime}{Total \; Minutes - Excluded \; Downtime}$$

"Total minutes" means the total number of minutes in the calendar month. "Downtime" means minutes during the month that the Commerce Platform Services are not available (including Excluded Downtime). "Excluded Downtime" includes: (i) planned downtime minutes for the month, which shall be any period for which Demandware gives twenty-four (24) hours or more notice that the Commerce Platform Services will be unavailable; planned downtime shall be capped at four hundred eighty (480) minutes per calendar month; and (ii) any unavailability caused by circumstances beyond Demandware's reasonable control, including without limitation, (a) the matters set forth in Section 13.8, (b) computer or telecommunications failures or delays involving hardware or software not within Demandware's possession or reasonable control, (c) network intrusions or denial of service attacks, (d) Customer's information content or application programming, and (e) acts or omissions of Customer or its agents.

Demandware will use commercially reasonable efforts to schedule all planned downtime during weekday hours from 2:00 a.m. to 7:00 a.m. in the time zone in which the applicable Realm is hosted. Demandware may release new versions of the Commerce Platform Services, typically on a quarterly basis, where functionality may be added to the Commerce Platform Services. The deployment of these new releases can take several hours to complete and Demandware will notify Customer in advance of any planned downtime associated with such releases. For any partial calendar month during which the Customer subscribes to the Commerce Platform Services, availability will be calculated based on the entire calendar month, not just the portion for which the Customer has subscribed. In addition, unavailability of some specific features or functions within the Commerce Platform Services, while others remain available, will not constitute unavailability of the Commerce Platform Services, so long as (i) such unavailability does not

impact the process necessary to carry out and complete an order from the Customer Web Site, and (ii) the unavailable features or functions are not, in the aggregate, material to the Commerce Platform Services as a whole.

**8. Confidentiality.**

**8.1 Definition of Confidential Information.** As used herein, "Confidential Information" means all confidential and proprietary information of a party ("Disclosing Party") disclosed to the other party ("Receiving Party"), whether orally or in writing, that is either marked or designated as confidential or is identified in writing as confidential or proprietary within fifteen (15) days of disclosure to the Receiving Party or that a reasonable person would deem confidential or proprietary given the nature of the information and the circumstances under which it is disclosed. Confidential Information shall include, but not be limited to: the terms and conditions of this Agreement (including pricing and other terms reflected in all Order Forms and Statements of Work hereunder), Customer Data, Consumer Data, the Services, Demandware Technology, Customer Technology, and the Disclosing Party's business and marketing plans, technology and technical information, product designs, and business processes. Confidential Information shall not include any information that a Receiving Party can show: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party; (iii) was independently developed by the Receiving Party without breach of any obligation owed to the Disclosing Party; or (iv) is received from a third party without breach of any obligation owed to the Disclosing Party.

**8.2 Confidentiality and Non-Use.** During the term of this Agreement and for a period of three (3) years thereafter, each party agrees to protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall either party exercise less than reasonable care in protecting such Confidential Information; provided that a Receiving Party may disclose Confidential Information of the Disclosing Party to its employees, agents and/or representatives who have a need to know such Confidential Information for purposes of this Agreement and who are bound to a written agreement protecting such Confidential Information as required hereby. In addition, without the Disclosing Party's written permission, the Receiving Party shall not use any Confidential Information of the Disclosing Party other than in connection with the Receiving Party's performance hereunder.

**8.3 Compelled Disclosure.** If the Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's expense, if the Disclosing Party wishes to contest the disclosure.

**8.4 Remedies.** If the Receiving Party discloses or uses (or threatens to disclose or use) any Confidential Information in breach of this Section 8, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts, it being specifically acknowledged by the parties that any other available remedies are inadequate.

**9. Warranties & Disclaimers.**

**9.1 Commerce Platform Services Warranty.** For the term of each subscription for the Commerce Platform Services and as long as Customer has paid all applicable fees due to Demandware hereunder, Demandware represents and warrants that the Commerce Platform

**ⓞdemandware**

Services will include the capabilities set forth in the Commerce Platform Services Capabilities Overview located at *xchange.demandware.com/Demandware MSA Information*, as such overview may be updated from time to time by Demandware.

**9.2 Client Services and Miscellaneous Services Warranty.** Unless otherwise specified in an Order Form or a Statement of Work, Demandware warrants that the Client Services and the Miscellaneous Services it provides hereunder will be of a professional quality conforming to generally accepted industry standards and practices. If Customer discovers a deficiency in the Client Services or the Miscellaneous Services, then Customer shall, within thirty (30) days after completion of the deficient Client/Miscellaneous Services, submit to Demandware a written report describing the deficiency in reasonable detail, and Demandware shall re-perform the deficient Client/Miscellaneous Services. If Demandware is unable to re-perform the Client/Miscellaneous Services, then, upon Customer's request, Demandware shall refund any payments that Customer has made for such Client/Miscellaneous Services. Any such Services for which Customer does not submit a deficiency report shall be deemed accepted at the conclusion of such thirty (30) day period.

**9.3 Mutual Warranty.** Each party represents and warrants that it has the legal power and authority to enter into this Agreement.

**9.4 Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED HEREIN, DEMANDWARE MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. DEMANDWARE HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF TITLE, MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

Demandware does not represent or warrant that: (i) the Services will meet Customer's business requirements; (ii) the Commerce Platform Services will be error-free or uninterrupted or that the results obtained from its use will be accurate or reliable; or (iii) all deficiencies in the Commerce Platform Services can be found or corrected. Demandware will not be responsible for: (a) any failure to meet the Commerce Platform Services warranty of Section 9.1 to the extent caused by acts within the control of Customer or any User or interoperability of specific Customer applications or equipment with the Commerce Platform Services; (b) loss of data that is not due to Demandware Data Security Breach; (c) the inability of Customer to access or interact with any other service provider through the Internet, other networks or users that comprise the Internet or the informational or computing resources available through the internet; or (d) service provided by other service providers.

**10. Indemnification.**

**10.1 Indemnification by Demandware.** Demandware shall defend, indemnify and hold Customer (as well as its Affiliates and their respective officers, directors and employees,) harmless against any claim (including reasonable attorneys' fees) incurred as a result of claims, suits, or proceedings ("Claims") brought against Customer by a third party contending that the use of the Commerce Platform Services infringes any U.S. patent, copyright or trade secret rights of a third party. In the event that the Commerce Platform Services or any part thereof are likely to, in Demandware's sole opinion, or do become the subject of an infringement related Claim, and Demandware cannot, at its option and expense, procure for Customer the right to continue using the Commerce Platform Services, or any part thereof, or modify the Commerce Platform Services, or any part thereof, to make them

non-infringing, then Demandware may terminate the Commerce Platform Services. Demandware shall have no liability for any Claim or demand arising from (i) an allegation that does not state with specificity that the Commerce Platform Services are the basis of the Claims; (ii) the use or combination of the Commerce Platform Services or any part thereof with software, hardware, or other materials not developed by Demandware where the Commerce Platform Services or use thereof would not constitute infringement but for said combination, (iii) modification of the Commerce Platform Services by a party other than Demandware, where the use of unmodified Commerce Platform Services would not constitute infringement (iv) an allegation that the Commerce Platform Services consist of a function, system or method that utilizes traditional online commerce functionality that is in general use in the industry, (v) an allegation of infringement deriving from Customer's general use or exploitation of the Internet, online commerce activity, systems or methods, or (vi) an allegation made against Customer prior to the execution of this Agreement or any allegation based upon actions taken by Customer prior to the execution of this Agreement, or relating to any patent that Customer was aware of prior to the execution of this Agreement. Customer shall bring to Demandware's attention any such prior or existing or known patent or other intellectual property Claims, demands or allegations made on it that are material to this section, in writing, prior to the execution of this Agreement. The foregoing states Demandware's entire liability and Customer's exclusive remedy for patent, copyright, trademark or other proprietary rights infringement.

**10.2 Indemnification by Customer.** Customer shall defend, indemnify and hold Demandware, its Affiliates, employees, officers, directors and shareholders harmless against any loss or damage (including reasonable attorneys' fees) incurred in connection with Claims (i) made or brought against Demandware by a third party alleging that the Customer Technology or Customer Data infringes the intellectual property rights of, or has otherwise harmed, a third party, (ii) based on the offer, marketing, sale design, construction, assembly, production, packaging, labeling, advertising, instructions or warnings (or lack thereof) of any products or services through the Customer Web Site(s), including Claims based upon infringement, product liability, personal injury or death relating to any products or services offered through the Customer Web Site(s), (iii) based upon any Users use of the Commerce Platform Services not in accordance with the terms hereof or (iv) based on a breach of Sections 3.3 or 3.4 of this Agreement.

**10.3 Indemnification Conditions.** Any indemnification obligations set forth in this Agreement shall be subject to the following conditions: (i) the indemnified party shall notify the indemnifying party in writing within thirty (30) days of learning of any claim or suit for which indemnification is sought (but failure to provide such notice will only modify indemnification obligation to the extent of prejudice suffered); (ii) the indemnifying party shall have control of the defense or settlement, *provided that* the indemnified party shall have the right to participate in such defense or settlement with counsel at its selection and at its sole expense; and (iii) the indemnified party shall reasonably cooperate with the defense, at the indemnifying party's expense.

**11. Limitation of Liability.**

**11.1 Limitation of Liability.** EXCEPT FOR AMOUNTS DUE HEREUNDER, LIABILITY ARISING FROM THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 10 AND LIABILITY ARISING FROM GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE GREATER OF $500,000 OR THE AMOUNTS

**ᗝdemandware**

ACTUALLY PAID BY AND DUE FROM CUSTOMER UNDER THE APPLICABLE STATEMENT OF WORK OR UNDER THE APPLICABLE ORDER FORM DURING THE TWELVE (12) MONTHS PRIOR TO THE DATE ON WHICH SUCH CLAIM OR CAUSE OF ACTION AROSE.

**11.2 Exclusion of Consequential and Related Damages.** EXCEPT FOR LIABILITY ARISING FROM THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 10 AND LIABILITY ARISING FROM GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY OR ANY DEMANDWARE PROVIDER HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. SOME STATES AND JURISDICTIONS DO NOT ALLOW LIMITATIONS ON DURATION OR THE EXCLUSION OF AN IMPLIED WARRANTY, SO THE ABOVE LIMITATION MAY NOT APPLY. Neither party shall be responsible or liable for any loss, damage or inconvenience suffered by the other or by any third person, to the extent that such loss, damage or inconvenience is caused by the failure of the other party to comply with its obligations under this Agreement.

**11.3 Data Security Breach.** THE LIMITATIONS SET FORTH IN SECTIONS 11.1 AND 11.2 SHALL NOT APPLY TO DIRECT DAMAGES ACTUALLY INCURRED BY CUSTOMER ARISING AS A RESULT OF ANY UNAUTHORIZED ACCESS, USE OR DISCLOSURE TO OR OF ANY CONSUMER DATA IN THE POSSESSION, CUSTODY OR CONTROL OF DEMANDWARE THAT IS DUE IN WHOLE OR IN PART TO A BREACH BY DEMANDWARE OF ITS OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING DEMANDWARE'S SECURITY POLICIES AND PROCEDURES (A "DEMANDWARE DATA SECURITY BREACH"), FOR WHICH DEMANDWARE'S AGGREGATE LIABILITY, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY SHALL NOT EXCEED THE GREATER OF (A) THE AMOUNTS ACTUALLY PAID BY CUSTOMER IN THE 24 MONTHS PRECEDING THE DATE THE CAUSE OF ACTION AROSE AND (B) $1,000,000.

**11.4 Limitation of Action.** Except for actions for non-payment or for breach of either party's intellectual property rights, no action (regardless of form) arising out of this Agreement may be commenced by either party more than two (2) years after the cause of action has accrued.

**12. Term & Termination.**

**12.1 Term of Agreement/Subscriptions.** This Agreement commences on the Effective Date and continues until all Statements of Work, Commerce Platform Services subscriptions and Order Forms entered into hereunder have terminated or expired, unless earlier terminated as provided below. Commerce Platform Services subscriptions commence on the start date specified in the relevant Order Form and continue for the subscription term specified therein.

**12.2    Termination.** This Agreement may be terminated:

(a)  by Customer (i) in accordance with Section 2.2 by providing written notice to Demandware within thirty (30) days of receiving notification from Demandware of any material and adverse change in the functionality of the Commerce Platform Services; or (ii) with respect to specific Order Forms, pursuant to the terms of Section 7.2;

(b)  by Demandware if Customer fails to timely make any payment due hereunder and fails to cure such default within thirty (30) days of receiving notice in writing from Demandware of such failure (whether or not Demandware avails itself of its right to suspend Services pursuant to Section 5.4 hereof); or

(c)  by either party in the event (i) the other party materially breaches any of its duties, obligations or responsibilities under this Agreement and fails to cure such breach or provide the other party with an acceptable plan for curing such breach within thirty (30) days after receipt by the breaching party of written notice specifying the breach; (ii) a receiver, trustee, administrator, or administrative receiver is appointed for the other party or its property; (iii) the other party makes an assignment for the benefit of creditors; (iv) any proceedings should be commenced against the other party under any bankruptcy, insolvency, or debtor's relief law, and such proceedings shall not be vacated or set aside within sixty (60) days from the date of commencement thereof; or (v) the other party is liquidated or dissolved.

**12.3 Outstanding Fees.** Termination shall not relieve Customer of the obligation to pay any fees accrued or payable to Demandware prior to the effective date of termination. In the event of termination of this Agreement by Customer pursuant to Section 12.2, promptly after the effective date of such termination, Demandware shall refund to Customer any prepaid fees paid by Customer for the remainder of the then current subscription term. Such refund shall not limit Customer's additional rights available under the law.

**12.4 Customer Data.** If Customer has paid all fees due hereunder, upon request by Customer made within thirty (30) days of the effective date of termination, Demandware will make available to Customer a facility for exporting Customer Data. After such thirty (30) day period, Demandware shall have no obligation to maintain or provide any Customer Data and shall thereafter delete all Customer Data in its systems or otherwise in its possession or under its control.

**12.5 Surviving Provisions.** The following provisions shall survive the termination or expiration of this Agreement for any reason and shall remain in effect after any such termination or expiration: Sections 4.4, 5, 6 (excluding Section 6.2), 8, 9, 10, 11, 12 and 13.

**13. General Provisions.**

**13.1    Relationship of the Parties.** This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary, or employment relationship between the parties and Demandware will be considered an independent contractor when performing any services hereunder.

**13.2 Notices.** All notices under this Agreement shall be in writing and shall be delivered to the addresses first set forth above. Notice shall be deemed to have been given upon receipt. Notices to Demandware shall be addressed to the attention of its Chief Financial Officer. Notices to Customer shall be addressed to the attention of its General Counsel. Either party may change its address for notice by giving notice of such address change in the manner provided herein.

**13.3 Waiver and Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

**13.4 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by

**ᗔdemandware**

law, and the remaining provisions of this Agreement shall remain in effect.

**13.5 Assignment.** Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the prior express written consent of the other party. Notwithstanding the foregoing, either party may assign this Agreement together with all rights and obligations hereunder, without consent of the other party, in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets related to this Agreement not involving a direct competitor of the other party. Any attempt by a party to assign its rights or obligations under this Agreement in breach of this section shall be void and of no effect. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**13.6 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions. The United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to this Agreement. Each party consents to, and agrees that each party is subject to, the exclusive jurisdiction of the state and federal courts of the State of New York with respect to any actions for enforcement of or breach of this Agreement.

**13.7 Compliance with Laws.** Each party shall comply with all laws or regulations applicable to its performance under this Agreement, including specifically and without limitation all United States and foreign export control laws and regulations.

**13.8 Force Majeure.** Except for the obligation to make payments, nonperformance of either party shall be excused to the extent that performance is rendered impossible by strikes or other labor problems, fire, flood, civil unrest, acts of terror, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control of the non-performing party.

**13.9 Entire Agreement.** This Agreement, together with the documents referenced herein and all Order Forms and Statements of Work executed hereunder, constitute the entire agreement between the parties as to its subject matter, and supersede all previous and contemporaneous agreements, proposals or representations, written or oral, concerning the subject matter of this Agreement. No modification, amendment, or waiver of any provision of this Agreement shall be

effective unless in writing and signed by the party against whom the modification, amendment, or waiver is to be asserted. Customer agrees that its agreement hereunder is not contingent upon the delivery of any future functionality or features not specified herein or in an Order Form nor dependent upon any oral or written, public or private comments made by Demandware with respect to future functionality or features for the Commerce Platform Services. In the event of any conflict between the provisions in this Agreement and any Order Form or Statement of Work, the terms of such Order Form or Statement of Work shall prevail. No terms or conditions stated in a Customer purchase order or in any other Customer order documentation shall be incorporated into or form any part of this Agreement, and all such terms or conditions shall be null and void.

**13.10 Counterparts.** This Agreement may be executed in counterparts (including counterparts delivered by facsimile or other electronic means), which taken together shall form one legal instrument.

**13.11 Construction.** The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (i) references to the plural include the singular, the singular the plural, and the part the whole, (ii) "or" has the inclusive meaning frequently identified with the phrase "and/or," (iii) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation," and (iv) references to "hereunder," "herein" or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation or agreement, including this Agreement, shall be deemed to include such statute, rule, regulation or agreement as it may be modified, varied, amended or supplemented from time to time. The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party and that ambiguities shall not be interpreted against the drafting party.

**13.12 Customer Advisory Board.** After Subscription Commencement, in advance of the next election of the Demandware Customer Advisory Board, if Customer meets all of the applicable membership criteria at the time of such election, Demandware agrees to nominate, recommend and endorse Finish Line to become a representative on the Demandware Customer Advisory Board for a single term.

IN WITNESS WHEREOF, the parties' authorized signatories have duly executed this Agreement as of the Effective Date:

**DEMANDWARE, INC.**

By: _Sflanetty_

Print Name: _Sheila Flanetty_

Title: _SVP & General Counsel_

Date: _3/29/12_

**THE FINISH LINE USA, INC.**

By: _W WL_

Print Name: _Edward Wilhelm_

Title: _CFO_

Date: _5-25-12_

CONFIDENTIAL

# ⏻demandware

**EXHIBIT A**
Order Form

Upon execution of this Order Form by Demandware and Customer, this Order Form shall be incorporated into and made a part of the Master Subscription and Services Agreement between Customer and Demandware (the "Agreement") dated as of May 25, 2012. All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

| | |
|---|---|
| Customer | The Finish Line USA, Inc. |
| Contact Name: | Christopher Ladd |
| Title: | EVP, CDO |
| Address: | 1881 9th Street |
| City: | Boulder |
| State: | Colorado |
| Zip: | 80302 |
| Phone: | |
| Fax: | |
| Email: | Cladd@finishline.com |
| Contact for Notices: | General Counsel |
| Email: | |
| Contact for Billing: | |
| Email: | |
| xChange Member Name: | |
| xChange Member Email: | |

| Item # | Part # | Description | Customer Fees |
|---|---|---|---|
| **Subscription** | | | |
| 1 | B2CGMV | Production Subscription, Business to Consumer GMV Plan<br> - percentage of GMV | Calculated as a percentage of GMV per the Subscription Pricing Schedule below, with monthly and annual minimums per Realm of:<br><br>           Monthly   Annual<br>Year 1   $90,000   $1,800,000<br>Year 2   $90,000   $2,070,000<br>Year 3   $90,000   $2,380,000<br><br>**Initial Term: 3 Years from Subscription Commencement.**<br><br>**Renewal: Customer shall have the unilateral right to extend the Term for one additional one year term at the same monthly and annual minimum as Year 3 of the Initial Term and at the same GMV rate as identified in the Subscription Pricing Schedule below by providing notice of its intent to renew no later than thirty (30) days prior to the end of the Initial Term.** |
| 2 | B2CDEV | Development Subscription | Calculated as $10,000 per month per Realm commencing on date Realm is provisioned. |
| 3 | DYNIMG | Dynamic Imaging | Calculated as $5,000 per year per Realm commencing on the date Realm is provisioned. |
| **Support & Training** | | | |

ʊdemandware

*MASTER SUBSCRIPTION AND SERVICES AGREEMENT*

| 3 | PSUPPORT | Product Support | Included as part of B2CGMV. |
|---|---|---|---|
| 4 | SSUPPORT | Solution Support | Provided on a retainer basis for a committed minimum of $30,000 per annum.  The retainer is drawn down by the half-hour at the rate of $75 per half hour. |
| 5 | TRAINING | Customer  Enablement Training | $20,400 for the Customer Enablement Training package, which includes a single delivery of each of the courses described below. |

Customer  Enablement  Training  Package  (See  the  Customer  Enablement  Training  Overview  located *xchange.demandware.com/Demandware MSA Information* for current course descriptions)

| | Course | Students* | Format** | Duration | Cost*** |
|---|---|---|---|---|---|
| 1 | Demandware Essentials Course | Unlimited | Online | Self Paced | $4,800 |
| 2 | Managing the Demandware Storefront Course | 6 | Private | 3 Days | $10,800 |
| 3 | Developing a Demandware Storefront Course | 2 | Public | 5 Days (4.5 days class, ½ day pre-work) | $6,000 |

Travel and Expenses:  Travel and expenses associated with delivery of training courses are not included in the Customer Enablement Training package costs and will be invoiced separately.  All such expenses must be consistent with Customer's expense policy, a copy of which is available upon request.

Minimum Training:  The  fees for Demandware's online Demandware Essentials Course will be invoiced on the date that Demandware first provides access to Demandware's Xchange Community to Customer.

*Additional attendees are subject to additional fees ($600 per person, per day for instructor led sessions). The maximum number of students per class is 12.

**Format: A private course is attended only by members of your staff. Private courses are subject to a 6 person minimum. A public course may be attended by staff from other organizations and are offered on a quarterly basis.

***The prices quoted for training are committed pricing terms only. With the exception of Demandware's online Demandware Essentials Course, training is Customer elected and in order to avail itself of this training, Customer must execute a training order form and pay the above fees associated therewith.

Subscription Pricing Schedule

| Annual Gross Merchandise Value (GMV) | | GMV Rate (%) |
|---|---|---|
| Min | Max | |
| $0M | $500M | 1.00% |
| $500M | Beyond | 0.75% |

Finish Line has the right to request revised pricing for additional, nontraditional online channels in the future. At that time, Demandware will provide a pricing schedule for the additional channel.

The following terms and conditions apply to this Order Form:

1)  Development Subscriptions. The Development Subscription (B2CDEV) the fees associated therewith commence upon the date that the Customer's Realm is provisioned.  The Development Subscription fees are billed monthly in advance, with the first invoice issued upon execution of this Order Form. Upon Subscription Commencement, the Development Subscription terminates and is replaced by the Production Subscription.

ʊdemandware                                    *MASTER SUBSCRIPTION AND SERVICES AGREEMENT*

2)  Production Subscriptions. The fee for the Commerce Platform Services (B2CGMV) for the Initial Term is a percentage of Gross Merchandise Value (GMV) subject to monthly minimum fees per Realm. The Production Subscription and the fees associated therewith commence upon the earlier of production launch of the initial Customer Web Site ("Subscription Commencement") or seven (7) months from the Effective Date. The parties may, by mutual written agreement, set a different date for Subscription Commencement. For purposes hereof, 'production launch' shall mean when the first sales order to be fulfilled is processed in the production instance of the Realm.  In the event that, in accordance with the terms hereof, the Production Subscription commences other than on the first day of a calendar month, Subscription Commencement, the first year of the Commerce Platform Services subscription and the monthly/annual fee payment obligations shall be deemed to commence on the first day of the calendar month following such commencement. GMV occurring during any partial month shall be invoiced at the GMV Rate of 1% (or otherwise as provided by the Subscription Pricing Schedule) and the Development Subscription fee for such month shall be prorated through the date of commencement, with the surplus Development Subscription fee credited against the GMV Fee for such partial month. GMV during such partial month shall not be included in the aggregate GMV for the first year of the Commerce Platform Services subscription. The first 3 months of minimum fees for the Production Subscription shall constitute an initiation payment and therefore will be invoiced and payable in advance upon the Effective Date.

3)  "Gross Merchandise Value" or "GMV" is reportable in US Dollars and is defined as the total dollar value of all transactions for goods and services in a calendar month generated through the Commerce Platform Services, after application of all applicable shopping cart discounts and promotions identified by the Customer as part of the transaction within the Commerce Platform Services.  GMV includes all processed transactions regardless of order and shipping status.  Shipping and handling charges and taxes, when identified by the Customer as part of the transaction within the Commerce Platform Services, are excluded from GMV.

4)  The Initial Term for this Commerce Platform Services Subscription shall be three years from Subscription Commencement. Thereafter, as provided above, Customer may unilaterally renew its Commerce Platform Services Subscription for one additional one year period at the same monthly and annual minimum as Year 3 of the Initial Term and at the same GMV rate as identified in the Subscription Pricing Schedule by providing notice of its intent to renew no later than thirty (30) days prior to the end of the Initial Term.

5)  Except as otherwise set forth herein, payment terms are as set forth in the Agreement. Demandware will invoice Customer on the first day of each month for Development and minimum Production Subscription fees; provided, however that, as set forth above, Customer will be invoiced for and pay in advance upon the Effective Date the first 3 months of minimum Customer Fees for the Production Subscription. Following Subscription Commencement, the Customer will also be invoiced following the conclusion of each month based on the actual volumes experienced in such month, applying prepaid minimum Production Subscriptions, as appropriate.  The Commerce Platform Services include five (5) development sandboxes.  Additional development sandboxes may be purchased at the cost of five-hundred dollars ($500) per month for each instance. The Commerce Platform Services include one production IP address. Each additional IP address will be subject to a one time set up fee of $1,000 per address. In addition, the Customer may be subject to additional fees as provided in the Demandware Data Resources Usage Policy, the current version of which is located at  *xchange.demandware.com/Demandware MSA Information.*

6)  Demandware Solution Support (SSUPPORT) is paid annually in advance on a committed retainer basis and will be invoiced upon Subscription Commencement. Solution Support shall automatically renew for additional one year periods during the Term and for one additional one-year period if Customer exercises its unilateral right of renewal at the conclusion of the Initial Term unless either party provides written notice of its intention not to renew the service no less than ninety (90) days prior to the end of the then-current term for the service.  Unused fees at the end of a support year will not be applied toward any subsequent year. All support cases covered under Solution Support will be logged and tracked in Demandware's case management system.  Time logged against each case will be rounded to the nearest ½ hour and applied against the retainer at the rate of $75 per half hour.

7)   Training/educational services delivered beyond those specified in the Customer Enablement Training Package will be subject to Demandware's then prevailing rates.

8)   Dynamic Imaging (DYNIMG) is an optional annual service and the nonrefundable fees for this service shall be paid by Customer annually in advance on a per-Realm basis.  The Dynamic Imaging service dynamically generates new product images from a single high resolution product image, reducing the overall number of product images that must be uploaded and managed as a small number of high resolution images can serve as the source of multiple derived images. The initial term of the Dynamic Imaging service is one year and shall automatically renew for additional one-year periods during the term and for one additional one-year period if Customer exercises its unilateral right of renewal at the conclusion of the Initial Term unless either party provides written notice of its intention not to renew the service no less than thirty (30) days prior to the end of the then-current term for the service.

ódemandware                                    *MASTER SUBSCRIPTION AND SERVICES AGREEMENT*

IN WITNESS WHEREOF, the parties' authorized signatories have duly executed this Order Form as of the Effective Date.

DEMANDWARE, INC.                               THE FINISH LINE USA, INC.

By: _____                 By: _____

Printed Name: Sheila Flaherty                  Printed Name: Edward Wilhelm

Title: SVP & General Counsel                   Title: CFO