UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMANDWARE, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>THE FINISH LINE USA, INC.,<br><br>    Defendant. | 13-cv-5617 (TPG)<br><br>**REPORT OF PARTIES' DISCOVERY CONFERENCE PURSUANT TO RULE 26(f)** |

Pursuant to the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure for the Southern District of New York, Plaintiff/Defendant-on-Counterclaim, Demandware, Inc. ("Demandware"), and Defendant/Plaintiff-on-Counterclaim, The Finish Line USA, Inc. ("Finish Line"), submit their Joint Rule 26(f) Report.  The parties met and conferred, as required by Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 26(a), on December 17, 2013.

**I.      SYNOPSIS OF CASE**

        **A.      <u>Demandware's Synopsis of the Case</u>**

By this civil action, Demandware seeks to recover damages of the defendant Finish Line for breach of the Master Subscription and Services Agreement between the parties and violation of the covenant of good faith and fair dealing implied in that agreement.  Notwithstanding the clear and unambiguous terms of the parties' contract, and in breach thereof, Finish Line has failed and refused to make payments to Demandware in an amount that now exceeds $6,600,000.  The plaintiff also seeks a declaration of the parties' rights and obligations pursuant to 28 U.S.C. §§ 2201, et seq., and Fed. R. Civ. P. 57.

Demandware and Finish Line entered into the Master Subscription and Services Agreement, together with an Order Form, on or about May 25, 2012 and, on or about June 13, 2012, signed a Statement of Work (the "Agreement").  The Agreement, which contains an initial three-year term, provided, *inter alia* that Demandware would make Commerce Platform Services (as defined in the Agreement) available to Finish Line pursuant to the terms and conditions of the Agreement.   In exchange, Finish Line agreed to pay minimum fees for the initial three-year term of the Agreement in the amount of $6,250,000.00 as follows:

|        | Monthly  | Annual     |
|--------|----------|------------|
| Year 1 | $90,000  | $1,800,000 |
| Year 2 | $90,000  | $2,070,000 |
| Year 3 | $90,000  | $2,380,000 |

The parties further acknowledged that, except as expressly provided in the Agreement, Demandware makes no warranty of any kind, whether express, implied, statutory, or otherwise and specifically disclaims all implied warranties, including without limitation, any warranty of merchantability, or fitness for a particular purpose, to the maximum extent permitted by applicable law.

The parties agreed expressly on specific terms relating to "availability," a Service Level Guarantee and the exclusive remedies to be applied in the event that Demandware was unable to meet the Service Level Guarantee.  The Agreement provided no other remedy, including the right to terminate the Agreement, in the event that Demandware was unable to meet the Service Level Guarantee.

Demandware began work under the Agreement and the SOW in or about June 2012 and collaborated closely with Finish Line personnel for approximately five months during the development and production phase of the project. During this development and production period, Finish Line imposed unreasonable completion deadlines on Demandware, repeatedly insisting that Demandware complete its work before the start of the holiday shopping season, notwithstanding Demandware's warnings that requiring a launch of the Commerce Platform Services without sufficient development and production time, could result in initial performance problems. Finish Line ignored Demandware's warnings. For example, Finish Line insisted that development work begin prior to the parties finalizing a feature specification document ("FSD") outlining the scope of the project despite Demandware's warnings that a lack of clarity in this document could result in delays.

Finish Line also retained third party contractors that it controlled that caused numerous problems during development and production resulting in delays for which Demandware had no responsibility.

On or about November 16, 2012, one week before "Black Friday," which is generally considered the start of the holiday shopping season, Demandware implemented the Commerce Platform Services. Notwithstanding the unprecedented traffic on the Finish Line website due to the combination of holiday shopping and a Michael Jordan sales campaign, Demandware was able to maintain availability of the Commerce Platform Services in compliance with the Service Level Guarantee specified in § 7 of the Agreement. Accordingly, Demandware satisfied the Service Level Guarantee as agreed, and otherwise performed the Agreement.

ActiveUS 120139765v.1

However, despite Demandware's satisfaction of the Service Level Guarantee, particularly under Finish Line's unreasonable challenges, Finish Line wrongfully accused Demandware of breaching the Agreement, and wrongfully ordered Demandware to terminate the Commerce Platform Services and "take down" the Finish Line Realm no later than December 6, 2012.  Demandware had no choice but to comply.

In breach of the Agreement, Finish Line failed and refused to provide written notice to Demandware specifying Demandware's alleged breach, or to provide Demandware with any opportunity to cure such alleged breach and ignored Demandware's plan for curing such alleged breach.  Thereafter, Finish Line has failed and refused to pay any additional fees to Demandware, including the minimum monthly and annual fees for the initial three-year term of the Agreement in the amount of $6,250,000.00, all as specified in the Order Form.  Demandware has suffered actual damages in unpaid fees as of May 15, 2013 in the amount of $6,635,479.06 caused by Finish Line's breach of the Agreement.

On October 21, 2013, Finish Line filed and served an answer and counterclaim denying any liability to Demandware and asserting affirmative claims against Demandware.  Finish Line alleges in its counterclaim that Demandware breached the Agreement by, *inter alia*, failing to perform the terms and provisions thereof.  Finish Line seeks an unspecified amount in damages.  On December 6, 2013, Demandware filed an answer to Finish Line's counterclaim denying any liability to Finish Line and asserting several affirmative defenses.  Demandware has requested the entry of a judgment dismissing Finish Line's counterclaim with prejudice and with costs to Demandware.

ActiveUS 120139765v.1

B.  **Finish Line's Synopsis of the Case**

In mid-2012, through the Master Subscription and Services Agreement ("Agreement") and Statement of Work ("SOW"), Finish Line hired Demandware to design, implement and then operate an e-commerce website through which Finish Line would sell its products to consumers. Demandware repeatedly assured Finish Line that the website would be ready before the 2012 holiday sales season and that it would accommodate the volume of Finish Line's customers.

In November 2012, on Demandware's recommendation, Finish Line launched the website. The website delivered by Demandware was substandard. The customer experience was, in a word, terrible. The website could not handle the volume of Finish Line's customers. The website did not include many required functionalities. The website displayed substantial amounts of incorrect information including, among other things, failing to display the correct price of the customer's order. As a result of these errors and others, Finish Line's customers were routinely unable to complete the sales process.

Even when customers were able to place an order, the orders electronically relayed from the website to Finish Line routinely contained errors resulting from Demandware's poorly designed website. For example, Demandware's programming resulted in orders being submitted for credit card authorizations where the ending zero of the orders was ignored. The result was that the credit card companies would authorize payment only at a fraction (1% or 10%) of the correct order total. The website failed to properly integrate with an outside vendor who provides sales tax information which

resulted in orders with the incorrect tax amount.  Finish Line incurred substantial expenses in correcting the orders submitted by Demandware.

The flaws in the website were caused by Demandware.  Demandware staffed the project with inexperienced employees and failed to adequately manage the subcontractors it retained.  Demandware failed to provide sufficient testing of the website before it was launched to the public.  For example, it is believed that Demandware processed only 300 test orders through the entire order process before the website was launched.  This testing was insufficient given that Finish Line routinely receives thousands of orders per hour on its website.

Because of the substantial financial impact to Finish Line and the impact of the substandard website on customer goodwill, Finish Line took the website off-line on December 6, 2012 and reinstitute use of its legacy e-commerce website.

After the Demandware website was taken off-line, Demandware and Finish Line engaged in discussions regarding the website's deficiencies.  Demandware submitted documents to Finish Line which confirmed numerous material breaches of the Agreement and SOW.  Demandware submitted a plan for completing (i.e., fixing and re-launching) the website .  That proposal contemplated 48 weeks of work at a cost of $1.32 million.  This proposal was both unacceptable and unreasonable, especially given that the original schedule for the completing the entire website was less than 48 weeks and the original cost of developing the website was $547,000.

Demandware's conduct constitutes a material breach of the Agreement and the SOW.  In addition, Demandware violated the implied duty of good faith and fair dealing.  As a result, Finish Line properly terminated its use of the website and it was not required

to submit the annual minimum payments claimed by Demandware.  In addition, Finish Line suffered damages including all payments made to Demandware, lost revenue and profits resulting from the unavailability of the website, lost revenue and profits resulting from incorrect orders and expenses associated with correcting the incorrect orders.  In the alternative to its breach of contract claim, Finish Line seeks rescission of the Agreement and SOW.

**II.    Fed R. Civ. P. 26(f)(3)(A) - Changes in the timing, form, or requirement for disclosures under Rule 26(a).**

The parties do not propose any changes to the form or requirements for disclosures under Rule 26(a).  Initial disclosures will be exchanged on or before January 6, 2014.

**III.   Fed R. Civ. P. 26(f)(3)(B) - Subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused on particular issues.**

   A.    <u>Proposed Case Schedule</u>

The parties propose the following schedule to govern discovery and trial in this case:

| EVENT | DATE |
|---|---|
| Initial Disclosures | Monday, January 6, 2014 |
| Amendments to Pleadings | Monday, April 25, 2014 |
| Close of Fact Discovery | Monday, July 7, 2014 |
| Due Date for Expert Reports for Parties Bearing the Burden of Proof | Thursday, August 21, 2014 |
| Due Date for Rebuttal Expert Reports | Monday, September 22, 2014 |

| | |
|---|---|
| Close of Expert Discovery | Monday, October 6, 2014 |
| Deadline for Filing Motions for Summary Judgment | Monday, November 10, 2014 |
| Joint Pretrial Report and Related Submissions | Tuesday, February 10, 2015 |
| Pretrial Conference | Tuesday, March 3, 2015 |
| Jury Trial | Tuesday, March 17, 2015 |

**IV.     FRCP 26(f)(3)(C) - Issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced.**

Disclosure or production of ESI will include data that is reasonably accessible to the parties in the ordinary course of business where the burden and expense of collecting and producing the data does not exceed the benefit under Rule 26(b)(2)(C)(iii), as agreed upon by both parties or by motion to the Court in the event that the parties cannot agree. The parties agree that the party producing the ESI shall be given the opportunity to review the data prior to production for the purpose of identifying responsive documents and privileged information.  A privilege log will be provided to the requesting party 30 days following the final production of documents (if productions are done on a rolling basis) or at another time if the parties agree to an alternative schedule.  Documents that are redacted on the basis of privilege do not need to be logged so long as the document date, custodian, sender, recipient(s), general subject matter and nature of the privilege asserted are reasonably apparent from the face of the redacted document.  If there are a large volume of privileged documents, the parties reserve the right to discuss a categorical log or other methods to reduce the burden of a detailed log.

ActiveUS 120139765v.1

The parties agree that both parties will produce documents that were originally maintained in electronic native format as single-page TIFF images along with Concordance load files.  Production in native format shall be required for spreadsheets and/or Microsoft Excel files; production in native format shall not be required for other file types, unless otherwise agreed.  A TIFF placeholder may be provided along with any documents produced in native format, such as Excel files.  The parties will also provide extracted text for documents originally maintained in native format that have not been redacted.  If the party is applying OCR to documents that do not have extracted text, that party will produce the OCR text for non-redacted OCRed documents.  The parties will discuss a reasonable list of metadata fields that will be provided with the production which, at a minimum, must include following: Beginning Bates Number, Ending Bates Number, Attachment Beginning Bates Number, Attachment Ending Bates Number, Custodian, To (for e-mails), From (for e-mails), cc (for e-mails), bcc (for e-mails), Author, Sent Date, Created Date, Last Modified Date, Subject, File Name, and MD5Hash.

For documents that were originally maintained in hard copy or for image files (such as TIFF or JPEG), the parties agree to provide documents in the same format identified above, except that the metadata fields provided will only be Custodian, Beginning Bates Number, Ending Bates Number, Attachment Beginning Bates Number, Attachment Ending Bates Number and File Name (where available).

**V.      FRCP 26(f)(3)(D) - Issues about claims of privilege or of protection as trial preparation materials.**

Any party who withholds privileged documents or other information will provide a log identifying such documents and providing sufficient information to allow the

opposing party to assess the basis for the assertion of privilege.  The parties agree that privilege logs need not be exchanged on the same date that discovery responses are due and will work together to find a mutually convenient date for the exchange of privilege logs.  The parties will also meet and confer with regard to any disputed assertions of privilege before resorting to motion practice.

The parties agree that privilege logs need disclose only those privileged documents dated prior to August 12, 2013, the date that the complaint was filed, and that the parties will agree not to pursue discovery of or seek a schedule of privileged documents dated on or after that date absent a showing of good cause as to particular documents.

**VI.     FRCP 26(f)(3)(E) - Changes in the limitations on discovery imposed under these rules or by local rule.**

**A.     Interrogatories**

The parties do not propose any modification to the limits on Interrogatories as set forth in the Federal Rules of Civil Procedure.

**B.     Document Requests**

The parties do not propose any modification to the limits on Document Requests as set forth in the Federal Rules of Civil Procedure.

**C.     Requests for Admission**

The parties do not propose any modification to the limits on Requests for Admission as set forth in the Federal Rules of Civil Procedure.

**D.     Depositions**

The parties do not propose any modification to the limits on Depositions as set forth in the Federal Rules of Civil Procedure.

**VII.    FRCP 26(f)(3)(F) - Any other orders that the court should issue under Rule 26(c) or under Rule 16(b) and (c).**

The parties will make a good faith effort to agree upon a protective order and to submit the agreed upon protective order to the Court for entry on or before January 6, 2014.

**VIII.    MISCELLANEOUS**

    **A.    Settlement**

The parties have discussed settlement options and, to date, have been unable to resolve the dispute.

    **B.    Alternative Dispute Resolution**

The parties are willing to discuss Alternative Dispute Resolution options and will inform the Court if the parties agree to an Alternative Dispute Resolution procedure.

    **C.    Electronic Exchange of Discovery**

The parties agree to exchange discovery demands electronically in addition to serving paper copies.

    **D.    Jury Trial**

Demandware requests a jury trial and estimates a 4 to 5 day trial. Finish Line estimates a 7-10 day trial.

Respectfully submitted,

| For Plaintiff/Defendant-on-Counterclaim, Demandware, Inc. | For Defendant/Plaintiff-on-Counterclaim The Finish Line USA, Inc.: |
|---|---|
| _s/ Robert Cultice_ | _s/ Kevin S. Batik_ |
| Robert Cultice<br>Marissa Eisenberg | Kevin S. Batik (Admitted Pro Hac Vice)<br>Gordon W. Schmidt (Admitted Pro Hac Vice) |

WilmerHale LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Dated:  December 31, 2013

McGuireWoods LLP
625 Liberty Avenue, 23rd Floor
Pittsburgh, Pennsylvania 15222
(412) 667-6000

Suzanne Amy Spencer
McGuireWoods LLP
1345 Avenue of the Americas , 7th Floor
New York, NY 10105-0106
(212) 548-7004

Dated: December 31, 2013